WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

PEDIATRIA P.C., an Arizona professional company, )
)
)
Plaintiff, )
)
vs. )
)
DIOPSYS, INC., a New Jersey corporation, )
)     No. 2:12-cv-1949-HRH
Defendant. )
—————————————————————— )

O R D E R

Motion for Summary Judgment

Defendant moves for summary judgment.[1] This motion is opposed.[2] Oral argument

was requested and has been heard.

Facts

Plaintiff is Pediatria, P.C.  Plaintiff, through Dr. Jaime Balderrama, offers primary

care for children ranging from newborn to eighteen years of age.

—————————————————

[1]Docket No. 44.

[2]Docket No. 49.

Defendant is Diopsys, Inc.  Defendant manufactures the Enfant Pediatric Vision Testing System, which is a visual evoked potentials (VEP) machine.  The VEP technology "evaluates [a person's] response to an external stimulus along the entire visual pathway from the lens of the eye to the visual cortex of the brain."[3]

In 2008, Dr. Balderrama received a publication entitled "Pediatric Coding Alert",[4] which suggested that "[i]f you want to test nonverbal patients for visual impairments, you may want to consider a visual evoked potentials machine that insurers often cover per test from a low of $30 to a high of $160."[5]  The Coding Alert stated that "[a]lthough payment for vision screening ... can prove hard to come by, reimbursement is much more straightforward for VEP test code 95930...."[6]  The Coding Alert contained a testimonial from Dr. Richard Lander, a "pediatrician at Essex-Morris Pediatric Group in Livingston, N.J.", who stated that "[i]t is a good screening test for amblyopia [lazy eye] that is able to test kids as young as 6 months old."[7]  The Coding Alert mentioned the Enfant Pediatric

---

[3]Enfant Brochure, Exhibit 6 at 3, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[4]The Coding Alert was prepared and distributed by the Coding Institute.

[5]Pediatric Coding Alert at Pediatria00691, Exhibit 3, Defendant's Motion for Summary Judgment, Docket No. 44.

[6]<u>Id.</u>

[7]<u>Id.</u>

Vision Testing System as a an example of a VEP machine.[8] The Coding Alert also contained statements by Diane C. Fulton, "director of insurance/medical coding and billing" for defendant.[9] Fulton stated that "[i]t's just not practical to send every child to a specialist for a test that the patient's pediatrician can do....  This test makes a difference in children's lives by catching vision problems that could affect their development at a time when they are most receptive to treatment."[10] Fulton also stated that "[i]nsurers reimburse the test 80 percent of the time, depending on your payer mix and geographic area[.]"[11] As for insurers which would not reimburse the test, Fulton stated that they do so because "[t]he insurer doesn't want to add the code to its capitation exceptions,... [o]r, the payer requires a specialist to perform the test based on antiquated intra-operative VEP guidelines."[12] The Coding Alert stated that "[c]ommercial plan payments range from $60 to $160" and Fulton stated that "Aetna sets the 'gold standard' of medical policies when it comes to VEP[,]" presumably because it "recognizes the importance of early vision testing during a well

---

[8]Id.

[9]Id.

[10]Id.

[11]Id. at Pediatria00692.

[12]Id.

check."[13]   The Coding Alert further stated that "[m]ost state Medicaid plans cover VEP. Ohio Medicaid pays the code at a low of $30, with many other state Medicaid plans paying about $90."[14]   The Coding Alert advised that "[s]ome plans may have outdated VEP policies.  For instance, Oxford's guidelines limit VEP coverage to the operating room or certain specialists."[15]   Lander advised that "[i]f an insurer states it is not a covered service, the patient has the option to pay at the time of service[.]"[16]   The Coding Alert suggested that doctors "[m]ake a chart of your payers' VEP policies focusing on noncovered versus covered.  Fulton follows VEP reimbursement trends across the country and can help facilitate this process...."[17]   The Coding Alert advised that

> [y]ou'll get paid the first time around for VEP tests if you use the payer-required V code and switch to a problem code when you should. ...  Because physicians often perform VEP during a preventative medicine service, you'll link 95930 ... to one of two V codes....  Most insurers cover the test during the well check with the preventative medicine service diagnosis. "Many commercial plans, as well as Aetna, accept V20.2 on the

---

[13]Id.

[14]Id.

[15]Id.

[16]Id.

[17]Id.

vision screening and on the preventative medicine service,"
says Diane C. Fulton....[18]

Dr. Balderrama testified that he had never considered VEP testing until he read the Coding Alert.[19] Dr. Balderrama testified that he then had a staff member contact defendant to request more information about the VEP machine.[20]

Defendant sent plaintiff written material about the Enfant VEP testing system. One brochure stated that the reimbursement code for VEP tests was 95930, that "[m]ost insurance plans cover the test during a child's well visit", that "[c]ommercial plan payments range from $60 - $160 per test" but that "[c]ommercial reimbursement varies by payer[,]" and that "Diopsys has a full-time Insurance/Medical Coding and Billing Group to assist your business staff with reimbursement."[21] Also included in the material was a "Billing and Coding Bulletin for Optometrists", which discussed the use of the 95930 code. The bulletin stated that "Medicare's allowable for global, bilateral CPT 95930 ranges from $77.04 to $152.51," that "[c]ommercial plan payments range from $60 to $160[,]"and that

---

[18]Id. at Pediatria00693.

[19]Deposition of Jaime A. Balderrama, M.D., at 7:20-23, Exhibit 2, Defendant's Motion for Summary Judgment, Docket No. 44.

[20]Id. at 13:20-24.

[21]Enfant Brochure, Exhibit 4 at Pediatria00044, Defendant's Motion for Summary Judgment, Docket No. 44.

"Diopsys monitors commercial allowables throughout the country and approximates the average at $79.68 based on payment trends."[22]

Dr. Balderrama then asked his staff to call the AHCCCS[23] insurance plans to see if they would cover VEP tests.[24]  Dr. Balderrama testified that he instructed his staff to ask if the VEP test would be covered if it were done as part of a well-child visit.[25]

Brenda Mena was a Pediatria staff member who called AHCCCS plans to see if VEP testing would be covered.  She testified that Dr. Balderrama "wanted [her] to look into the Medicaid plans themselves to find out if they covered the vision, if the testing was covered

---

[22]Exhibit 6 at Pediatria00002, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[23]AHCCCS stands for Arizona Health Care Cost Containment System, which is Arizona's Medicaid agency. "[A]pproximately 80-85% of [p]laintiff's patients had a health insurance plan with [AHCCCS] through six (6) of its affiliated insurance companies/plans – Mercy Care, Care First, Health Choice, Phoenix Health Plan, APIPA, and Maricopa...." Declaration of Dr. [Jaime] Balderrama at 1, ¶ 6, Exhibit 18, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[24]Jaime Balderrama Deposition at 17:21-25, Exhibit 2, Defendant's Motion for Summary Judgment, Docket No. 44.

[25]Id. at 21:13-15.  A visual examination is part of a well-child visit and is usually done in accordance with the Snellen test, which involves the use of a eye chart to determine a patient's visual acuity.  Dr. Balderrama Declaration at ¶ 9, Exhibit 18, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.  For babies and toddlers who cannot read yet, Dr. Balderrama stated that he could only manually examine their eyes for an abnormality.  Id. at ¶ 10.

-6-

under their plan."[26]  She testified that she "asked if the CPT code, the 95930, was covered under the well-care. And the plans told us if it's in the primary care physician's office, yes, it is covered."[27]  Mena testified that she recalled telling some of the plans that plaintiff was considering buying a VEP testing machine and that it "need[ed] to know if it's covered under their plan, if it requires a prior authorization."[28]

Cynthia Sukung was another Pediatria staff member who "call[ed] the insurance plans to verify if this code [95930] would be covered within the PCPs office."[29]  Sukung testified that she believed that she called Mercy Care and Care First and that Care First said that prior authorization would be required.[30]

Dr. Balderrama testified that he had his staff call more than once to verify that VEP test would be covered by the AHCCCS plans and that he also had them check with "some of the commercial plans ... and all of them say yes, it was covered.  So if this was a blanket

---

[26]Deposition of Brenda Mena at 6:23-25, Exhibit 5, Defendant's Motion for Summary Judgment, Docket No. 44.

[27]Id. at 8:7-10.

[28]Id. at 8:22-9:2.

[29]Deposition of Cynthia Sukung at 8:18-20, Exhibit 6, Defendant's Motion for Summary Judgment, Docket No. 44.

[30]Id. at 14:6-9.

yes, it really looked that it could be appropriate and advisable for us to perform the test, we were thinking about it quite seriously from there on."[31]

Dr. Balderrama testified that plaintiff then contacted defendant and found out that the price of the Enfant VEP testing system was $35,000.[32] Dr. Balderrama testified that at this point in time, he was in contact with defendant's sales representative in California, Don Fellows, and that Fellows was calling him and asking him when he was going to purchase a testing system.[33]

Dr. Balderrama testified that defendant gave him the names of two physicians who were using the Enfant VEP testing system and that he contacted one of them, a doctor in New Jersey.[34] The doctor told Dr. Balderrama that defendant's machine was "pretty good", which Dr. Balderrama said meant "that it was working for him and he was billing and he was being paid and he didn't have apparently any other issues with I would assume

[31]Jaime Balderrama Deposition at 23:24 - 24:9, Exhibit 2, Defendant's Motion for Summary Judgment, Docket No. 44.

[32]Id. at 24:11-17; Jaime Balderrama Deposition at 26:5-14, Exhibit 1, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[33]Jaime Balderrama Deposition at 26:15-24, Exhibit 1, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[34]Jaime Balderrama Deposition at 34:17-23, Exhibit 2, Defendant's Motion for Summary Judgment, Docket No. 44.

Medicaid from New Jersey."[35]  Dr. Balderrama testified that the doctor stated that he was using defendant's VEP machine during well-child exams and that "he specifically said that the Medicaid plan in New Jersey was paying for the tests[.]"[36]

Defendant also sent plaintiff a cash flow analysis for leasing an Enfant VEP testing system.[37]  The cash flow analysis showed that if a practice did 10 VEP tests per day, based on 21 working days per month, the practice would earn a 5-year net profit of $793,852.80.[38]  Defendant advised that the "[c]ash flow analysis is not a guarantee of profitability, rather a projection based on current pricing and assumptions provided by you."[39]

Dr. Balderrama avers that "[d]efendant's representatives specifically advised [him] to use the System to conduct tests during well-child examinations and to submit claims to AHCCCS under ... Code 95930."[40]  Dr. Balderrama also avers that "[d]efendant's representatives represented to me during oral communications that AHCCCS had confirmed that claims submitted by [p]laintiff to AHCCCS relating to the use of the System

---

[35]Id. at 34:23-35:3.

[36]Id. at 35:8-19.

[37]Exhibit 8, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[38]Id.

[39]Id.

[40]Dr. Balderrama Declaration at ¶ 14, Exhibit 18, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

during well-child examinations would be paid by AHCCCS."[41] Sukung testified that prior to plaintiff leasing the Enfant VEP testing system, Fulton told them that the time to do the test was during a well-child exam.[42] She also testified that she thought Fulton told her that defendant had called the AHCCCS plans and had been told that the code was billable through AHCCCS, "that it is covered service through AHCCCS and we should not have any problems billing for this code."[43]

Fulton testified that she did not personally contact AHCCCS or the AHCCCS plans to check if a VEP test would be covered if performed during a well-child exam.[44] But, she testified that around November 17, 2008, she had her assistant contact the insurance plans that had been provided by Dr. Balderrama "to confirm if the service was payable to the pediatrician, at what amount and under what diagnostic codes."[45] Fulton testified that most of the plans confirmed that they would pay for the service.[46]

---

[41]Id. at ¶ 15.

[42]Sukung Deposition at 17:6-24, Exhibit 7, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[43]Id. at 28:7-21.

[44]Deposition of Diane C. Fulton at 50:25-51:15, Exhibit 4, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[45]Fulton Deposition at 123:3-16, Exhibit 9, Defendant's Motion for Summary Judgment, Docket No. 44.

[46]Id. at 123:17-23.

On October 31, 2008, plaintiff signed a Sales Order with defendant for an Enfant Pediatric VEP Vision Testing System at the cost of $25,000.[47] On November 7, 2008, plaintiff entered into a financing and lease agreement with Affinity One Business Finance that allowed plaintiff to make monthly installment payments on the Enfant Pediatric VEP Vision Testing System in the amount of $798.00 per month.[48] The parties' agreement also required plaintiff to pay defendant $10.00 for each test performed by plaintiff.[49]

Sometime after plaintiff signed the Sales Order, defendant provided plaintiff with a document entitled "Visual Evoked Potential Reimbursement Information: Arizona."[50] In this document, Fulton stated that defendant

> support[s] the use of [its] equipment and reimbursement to your practice by monitoring insurance payment trends. Therefore, we are requesting that you provide us with your practice's Insurance Payor Mix and EOBs that reflect your practice's specific insurance allowables and denials.[[51]]

The document provided some coding examples, but stated that "[m]edical [p]olicies vary by insurance.  Coding suggestions are based on testing experience and may not be accepted

---

[47]Exhibit 7 at 1, Defendant's Motion for Summary Judgment, Docket No. 44.

[48]Exhibit 8, Complaint, attached to Notice of Removal, Docket No. 1.

[49]Sales Order at 1, Exhibit 7, Defendant's Motion for Summary Judgment, Docket No. 44.

[50]Exhibit 8, Defendant's Motion for Summary Judgment, Docket No. 44.

[51]Id. at 2.

by all insurance plans.  Please communicate any coding concerns to Diopsys."[52]  In the

document, defendant recommended "test[ing] all children 6 months to 8 years of age."[53]

Fulton testified that defendant did not have plaintiff's "payor mix" prior to plaintiff

leasing the Enfant VEP testing system.[54]  Fulton advised Fellows that she was not pleased

that the machine had been installed for plaintiff prior to getting this information.[55]

Plaintiff began performing VEP tests in November 2008.  Between November 20,

2008 and August 10, 2010, plaintiff billed AHCCCS for 2,947 VEP tests for which it was

paid $222,323.85.[56]  Mena testified that someone from defendant physically came to

plaintiff's office to train the staff on billing for the VEP tests.[57]

About one year after plaintiff began using the Enfant VEP testing system, Health

Choice, one of the AHCCCS plans, began denying plaintiff's claims for VEP tests.[58]  On

---

[52]Id. at 3.

[53]Id. at 9.

[54]Fulton Deposition at 100:19-101:2, Exhibit 4, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[55]Id. at 104:7-23.

[56]Report of Investigation at 6, Exhibit 10, Defendant's Motion for Summary Judgment, Docket No. 44.

[57]Mena Deposition at 10:7-11:18, Exhibit 13, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[58]Mena Deposition at 17:24-18:14, Exhibit 5, Defendant's Motion for Summary
(continued...)

-12-

February 17, 2010, Health Choice's compliance officer contacted AHCCCS about the alleged improper use of the 59530 code for VEP tests done during well-child exams.[59]  On March 25, 2010, AHCCCS advised plaintiff that it was investigating its alleged improper use of the 59530 code.[60]

AHCCCS completed its investigation on August 10, 2010 and concluded that plaintiff had improperly billed Code 95930 for VEP testing during well-child examinations.[61]  This conclusion was based, in part, on the opinion of Dr. Marc Leib, AHCCCS's chief medical officer.  Dr. Leib

> stated that CPT Code 95930 ... is not a visual exam code. Nothing about this test provides any information regarding visual acuity, refractions or the need to refer to an ophthalmologist/optometrist for a refraction....  There is no reason a general pediatrician should be performing this test as part of a well-child EPSDT exam....  It also should not be used as a screening exam to identify kids that may need referrals to a peds neurologist.[62]

---

[58](...continued)
Judgment, Docket No. 44.

[59]Report of Investigation at 3, Exhibit 10, Defendant's Motion for Summary Judgment, Docket No. 44.

[60]Case Initiation at 1, Exhibit 12, Defendant's Motion for Summary Judgment, Docket No. 44.

[61]Report of Investigation at 4, Exhibit 10, Defendant's Motion for Summary Judgment, Docket No. 44.

[62]Id. at 3.

At his deposition in this case, Dr. Leib testified that a VEP test is "a test to be used by specialists who treat multiple sclerosis."[63]  He testified that he could not "think of a reason why a family practice or general pediatrician would purchase a relatively expensive piece of equipment to do a test that's only done on a small segment of the population suspected of having a rare disease."[64]

In September 2010, Dr. Leib, on behalf of AHCCCS, issued a statement about VEP tests and well-child exams.  The statement read:

> A recent review of claims data revealed that a few physicians appear to be performing a visual evoked potential exam as part of nearly every well-child EPSDT exam.  Our review of this relatively recent development suggests that at least one manufacturer of the equipment used to perform this service (CPT code 95930 ...) has marketed this equipment to pediatricians and family practice physicians along with the advice that these services are covered and should be claimed using this CPT code.
>
> VEPs are not routine screening exams for all infants and children.  Where there is a clinical indication that this type of exam may be necessary to determine whether a specific ophthalmologic or neurologic abnormality exists, a VEP exam may be one of the indicated testing procedures.  Ordinarily these tests would be performed by an ophthalmologist, neurologist, pediatric ophthalmologist, pediatric neurologist or an optometrist trained to provide these testing procedures.

---

[63]Deposition of Marc Leib at 88:5-7, Exhibit 3, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[64]Id. at 88:13-17.

-14-

These tests are not appropriate for routine visual acuity screening, such as the use of a Snellen chart.

In addition, age-appropriate routine screening exams are included in the EPSDT exams.  Therefore, if VEPs were considered appropriate routine screening for visual acuity or other visual problems, no separate payment would be made for those exams.  That is not the intent for AHCCCS.  When performed for appropriate, medically necessary indications, physicians may be paid for performing VEP exams.  However, the routine use of this test as a screening exam is not medically necessary.[65]

Dr. Leib testified that it would be contrary to AHCCCS's overall policies to pay for a VEP test as a part of a well-child exam and that he did not know on what basis anyone at AHCCCS would have told someone differently.[66]

On November 23, 2010, Dr. Balderrama entered into a settlement with AHCCCS. Dr. Balderrama agreed to pay $100,000 for the overpayments and $2,000 for investigative costs.[67]

On August 9, 2012, plaintiff commenced this action.  In its complaint, plaintiff asserts fraud in the inducement and negligent misrepresentation claims.

Defendant now moves for summary judgment on plaintiff's claims.

---

[65]Exhibit 16, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[66]Leib Deposition at 94:5-11, Exhibit 2, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[67]Settlement Agreement at 1, Exhibit 13, Defendant's Motion for Summary Judgment, Docket No. 44.

<u>Discussion</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to show that there is an absence of genuine issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor.  <u>Id.</u> at 255.  "[T]he court's ultimate inquiry is to determine whether the specific facts set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence."  <u>T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 (9th Cir. 1987).

Defendant argues that it is entitled to summary judgment on plaintiff's fraud in the inducement[68] and negligent misrepresentation claims because there is no evidence that it

---

[68]At times, the parties refer to this claim as a fraudulent misrepresentation claim and cite authority that pertains to fraudulent misrepresentation claims.  A fraudulent misrepresentation claim requires proof of the same nine elements as a fraud in the inducement claim.  See <u>Dillon v. Zeneca Corp.</u>, 42 P.3d 598, 603 (Ariz. Ct. App. 2002) (listing elements of a fraudulent misrepresentation claim).

knowingly made a false representation.   Under Arizona law, a claim for fraudulent

inducement requires proof of

> "(1) a representation; (2) its falsity; (3) its materiality; (4) the
> speaker's knowledge of its falsity or ignorance of its truth; (5)
> the speaker's intent that it be acted upon by the recipient in the
> manner reasonably contemplated; (6) the hearer's ignorance of
> its falsity; (7) the listener's reliance on its truth; (8) the right to
> rely on it; and (9) his consequent and proximate injury."

Meritage Homes Corp. v. Hancock, 522 F. Supp. 2d 1203, 1218 (D. Ariz. 2007) (quoting

Wells Fargo Credit Corp. v. Smith, 803 P.2d 900, 905 (Ariz. 1990)).

> The elements of negligent misrepresentation in Arizona are: (1)
> one who in the course of his business, profession or employ-
> ment or in any other transaction in which it has a financial
> interest, (2) supplies false information, (3) for the guidance of
> others in their business transactions, which, (4) causes pecuni-
> ary damage (5) based on the other party's justifiable reliance on
> the information and (6) fails to exercise reasonable care or
> competence in communicating the information.

Salgado v. America's Servicing Co., Case No. CV–10–1909–PHX–GMS, 2011 WL 3903072,

at *4 (D. Ariz. Sept. 6, 2011) (citing McAlister v. Citibank, 829 P.2d 1253, 1261 (Ariz. Ct.

App. 1992)).

There is no evidence that any of defendant's statements in the brochures that

plaintiff received were false and plaintiff does not seriously contend otherwise.   Rather,

plaintiff focuses on its contention that defendant represented that it had contacted

AHCCCS prior to plaintiff leasing the Enfant VEP testing system to confirm that the testing would be covered.

There may be questions of fact as to whether defendant contacted the AHCCCS plans prior to plaintiff leasing the Enfant VEP testing system. Sukung testified that she thought Fulton told her that defendant had contacted the AHCCCS plans,[69] and Dr. Balderrama avers that he was told that defendant had confirmed with AHCCCS that VEP testing would be covered.[70] It is possible to infer that this information was given to Sukung and Dr. Balderrama prior to plaintiff leasing the Enfant VEP testing system. Fulton, however, testified that she did not have her assistant contact the AHCCCS plans until November 17, 2008,[71] which was after plaintiff had signed the lease agreement. But, there is no issue of fact as to what defendant was told when it did contact the AHCCCS plans. Sukung testified that Fulton told her that the code was billable through AHCCCS, "that it is covered service through AHCCCS and we should not have any problems billing for this

---

[69]Sukung Deposition at 28:7-21, Exhibit 7, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[70]Dr. Balderrama Declaration at ¶ 15, Exhibit 18, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[71]Fulton Deposition at 123:3-16, Exhibit 9, Defendant's Motion for Summary Judgment, Docket No. 44.

code,"[72] and Fulton testified that most of the plans confirmed that they would pay for the

service.[73]   This is the exact same information that plaintiff's staff had been told by the

AHCCCS plans.   Thus, any factual dispute as to <u>when</u>  defendant contacted the AHCCCS

is not material because defendant would have been given the same information, regardless

of when it contacted the AHCCCS plans, namely that the AHCCCS plans, or at least most

of them, would cover VEP testing.   Any representation by defendant that AHCCCS or the

AHCCCS plans had said that VEP testing would be covered was not false at the time it was

made.   Defendant had every reason to believe that the AHCCCS plans would pay for VEP

testing.   Whether or not AHCCCS at some point changed its policy as to VEP testing, the

fact of the matter is that in 2008 the AHCCCS plans told both defendant and plaintiff that

VEP testing during well-child exams would be covered.   Moreover, the AHCCCS plans

paid plaintiff for VEP testing for almost two years.   Viewing the evidence in the light most

favorable to plaintiff, no reasonable jury could find defendant liable for fraudulent

inducement or negligent misrepresentation based on the fact that defendant may not have

---

[72]Sukung Deposition at 28:7-21, Exhibit 7, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[73]Fulton Deposition at 123:17-23, Exhibit 9, Defendant's Motion for Summary Judgment, Docket No. 44.   Plaintiff's contention that Fulton's assistant did not ask the correct questions is nothing more than speculation.   Fulton testified that she had her assistant "confirm if the service was payable to the pediatrician,  at what amount, and under what diagnostic codes."   <u>Id.</u> at 123:11-16.

contacted the AHCCCS plans prior to plaintiff leasing the Enfant VEP testing system to confirm that VEP testing would be covered.

Plaintiff also argues that defendant's cash flow analysis for leasing an Enfant VEP testing system was misleading. The cash flow analysis showed that if a practice did 10 VEP tests per day, based on 21 working days per month, the practice would earn a 5-year net profit of $793,852.80.[74] Plaintiff argues that this information was misleading because Dr. Leib testified that it would be unprecedented for any pediatrician to perform this many VEP tests.[75] However, at the time defendant made the representations in the cash flow analysis it had reason to believe that most insurance plans would pay for VEP testing during a well-child exam, given that physicians in other states were being reimbursed for the VEP testing they were doing during well-child exams. No reasonable jury could find defendant liable for fraudulent inducement or negligent misrepresentation based on the representations in the cash flow analysis.

In sum, there are no genuine issues of material fact as to whether defendant made any false representations to plaintiff about AHCCCS coverage for VEP testing.[76] Defendant

---

[74]Exhibit 8, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[75]Leib Deposition at 100:13-18, Exhibit 3, Plaintiff's Separate Statement of Facts [etc.], Docket No. 50.

[76]Because there are no genuine issues of material fact as to whether defendant made any false representations, the court need not consider defendant's arguments as to
(continued...)

is entitled to summary judgment on plaintiff's fraudulent inducement and negligent misrepresentation claims.

Conclusion

Defendant's motion for summary judgment[77] is granted.  The clerk of court shall enter judgment dismissing plaintiff's complaint with prejudice.

DATED at Anchorage, Alaska, this 21st day of February, 2014.

/s/ H. Russel Holland
United States District Judge

---

[76](...continued)
damages, mitigation of damages, the economic loss rule, and punitive damages.

[77]Docket No. 44.